## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NEW JERSEY DEMOCRATIC STATE COMMITTEE,

        Plaintiff,

v.

NEW JERSEY OATH KEEPERS, an unincorporated association,

        Defendant.

Civil Action No.: _____

_____

## BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE FOR TEMPORARY RESTRAINTS AND INJUNCTIVE RELIEF

_____

Rajiv D. Parikh, Esq.
Brett M. Pugach, Esq.
**GENOVA BURNS LLC**
494 Broad Street
Newark, NJ 07102
973-533-0777
*Attorneys for Plaintiff,*
*New Jersey Democratic State Committee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ………………………………………………………… iii

PRELIMINARY STATEMENT …………………………………………………… 1

I.      STATEMENT OF FACTS……………………………………………………2

II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS …………………… 2

      A.      Plaintiff Is Likely to Prevail On Its Claim Under Section 11(b) Of The
            Voting   Rights Act…………………………………………………………..2

      B.      Plaintiff Is Likely to Prevail On Its Claim Under The Ku Klux Klan Act,
            42 U.S.C. § 1985 (3) ……………………………………………………….. 7

      C.      Defendants Have No Legally Cognizable Interest In Voter Intimidation
            Tactics …………………………………………………………………9

III.    PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
      PRELIMINARY RELIEF ……………………………………………………11

IV.     THE BALANCE OF EQUITIES FAVORS PLAINTIFF …………………………13

      A.      Preventing Voter Intimidation And Coercion Is A Critical Interest
            Enshrined In Federal Law ……………………………………………13

      B.      Widespread Or Systemic Voter Fraud Is A Myth …………………….....14

V.      A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ……………15

      A.      The Preliminary Relief Plaintiff Seeks Would Simply Enforce Federal
            Law ……………………………………………………………………15

      B.      The Public Interest Is Advanced By Securing The Right To Vote,
            Not By Its Suppression…………………………………………………… 16

VI.     CONCLUSION …………………………………………………………17

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

Allen v. State Bd. of Elections,
   393 U.S. 544 (1969) .................................................................................. 3

Applewhite v. Commonwealth,
   No. 330 M.D. 2012, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014) ............................... 15

Arizona v. Inter Tribal Council of Arizona, Inc.,
   133 S. Ct. 2247 (2013) ................................................................................ 14

Baker v. Carr,
   369 U.S. 186 (1962) .................................................................................. 13

Bretz v. Kelman,
   773 F.2d 1026  (9th Cir. 1985) ......................................................................... 7

Burson v. Freeman,
   504 U.S. 191 (1992) .................................................................................. 13

Cameron v. Johnson,
   262 F. Supp. 873 (S.D. Miss. 1966) ...................................................................... 3

Cardona v. Oakland Unified Sch. Dist., Cal.,
   785 F. Supp. 837 (N.D. Cal. 1992) ..................................................................... 12

Cotz v. Mastroeni,
   476 F. Supp. 2d 332 (S.D.N.Y. 2007) .................................................................... 9

Council of Alternative Political Parties v. Hooks,
   121 F.3d 876 (3d Cir. 1997) ........................................................................ 11, 16

Crawford v. Marion County Election Bd.,
   472 F.3d 949 (7th Cir. 2007) ......................................................................... 11

Crawford v. Marion County Election Bd.,
   553 U.S. 181 (2008) ............................................................................... 11, 15

Dailey v. Hands,
   No. 14-cv-423-KD-M, 2015 WL 1293188, (S.D. Ala. Feb. 20, 2015) ......................................... 9

Daschle v. Thune, TRO at 2,
   No. 04-cv-4177 (D.S.D. Nov. 2, 2004) ................................................................... 5

Democratic Nat'l Comm. v. Republican Nat'l Comm.,
   671 F. Supp. 2d 575  (D.N.J. 2009),
   aff'd, 673 F.3d 192 (3d Cir. 2012) .................................................................. 2, 9, 10, 11

Fish v. Kobach,
   __ F.3d __, 2016 WL 6093990 (10th Cir. Oct. 19, 2016) .................................................... 12

Fowler v. Borough of Westville,
   97 F. Supp. 2d 602 (D.N.J. 2000) ......................................................................... 4

Frank v. Walker,
   17 F. Supp. 3d 837 (E.D. Wis. 2014) .................................................................... 15

Gray v. Main,
   291 F. Supp. 998 (M.D. Ala. 1966) ....................................................................... 3

Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,
   388 F.3d 327  (7th Cir. 2004) ........................................................................... 4

Instant Air Freight Co. v. C.F. Air Freight, Inc.,
   882 F.2d 797  (3d Cir. 1989) ........................................................................... 1

Jackson v. Riddell,
   476 F. Supp. 849 (N.D. Miss. 1979) ...................................................................... 3

Lacey v. Maricopa Cty.,
   693 F.3d 896 (9th Cir. 2012) ........................................................................... 8

League of Women Voters of North Carolina v. North Carolina,
   769 F.3d 224  (4th Cir. 2014) ....................................................................... 12, 16

Lee v. Va. State Bd. of Elections,
   No. 15-cv-357 (HEH), 2016 WL 2946181 (E.D. Va. May 19, 2016) .................................... 15

Melendres v. Arpaio,
   695 F.3d 990 (9th Cir. 2012) .......................................................................... 11

Mont. Democratic Party v. Eaton,
   581 F. Supp. 2d 1077  (D. Mont. 2008) ................................................................ 10

Ne. Ohio Coal. for the Homeless v. Husted,
   2016 WL 3166251 (S.D. Ohio June 7, 2016),
   aff'd in part and rev'd in part, __ F.3d __, 2016 WL 4761326
    (6th Cir. Sept. 13, 2016) ....................................................................... 10, 11, 16

One Wis. Inst. v. Thomsen,
   No. 15-civ-324 (JDP), 2016 WL 4059222 (W.D. Wis. July 29, 2016) ................................... 15

Pakootas v. Teck Cominco Metals, Ltd.,
    830 F.3d 975 (9th Cir. 2016) ................................................................. 3

Purcell v. Gonzalez,
    549 U.S. 1  (2006) ................................................................................ 16

Sandusky Cty. Democratic Party v. Blackwell,
    387 F.3d 565 (6th Cir. 2004) ............................................................... 11

Smiley v. Holm,
    285 U.S. 355 (1932) ............................................................................. 14

South Carolina v. Katzenbach,
    383 U.S. 301  (1966) ...................................................................... 3, 14

Tiryak v. Jordan,
    472 F. Supp. 822 (E.D. Pa. 1979) ...................................................... 10

Turner v. Cooper,
    583 F. Supp. 1160 (N.D. Ill. 1983) ................................................. 9, 10

United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,
    463 U.S. 825 (1983) .......................................................................... 7, 8

United States v. Clark,
    249 F. Supp. 720 (S.D. Ala. 1965) ...................................................... 5

United States v. Madden,
    403 F.3d 347  (6th Cir. 2005) ............................................................. 13

United States v. Nguyen,
    673 F.3d 1259 (9th Cir. 2012) .............................................................. 4

Veasey v. Abbott,
    830 F.3d 216 (5th Cir. 2016) .................................................... 2, 10, 15

Veasey v. Perry,
    71 F. Supp. 3d. 627 (S.D. Tex. 2014) ................................................ 10

Wash. Ass'n of Churches v. Reed,
    492 F. Supp. 2d 1264 (W.D. Wash. 2006) .......................................... 16

Whatley v. Vidalia,
    399 F.2d 521 (5th Cir. 1968) ................................................................ 3

Williams v. Rhodes,
    393 U.S. 23 (1968) ......................................................................... 12, 13

Willingham v. Cnty. of Albany,
  593 F. Supp. 2d 446 (N.D.N.Y. 2006) .................................................................... 3

Yick Wo v. Hopkins,
  118 U.S. 356  (1886) ............................................................................................... 13

**STATUTES**

N.J.S.A. 19:34-6 ........................................................................................................ 16

**<u>OTHER AUTHORITIES</u>**

§ 1985(3) .............................................................................................................. 7, 8

28 U.S.C. § 1343(a)(4) ............................................................................................... 3

42 U.S.C. § 1985 .......................................................................................... 1, 7, 14, 16

42 U.S.C. § 1985(3) ...................................................................................... 1, 7, 14, 16

52 U.S.C. § 10307(b) ........................................................................................... passim

**<u>RULES</u>**

Fed. R. Civ. P. 65(a ................................................................................................... 1

L. Civ. R. 65.1 .......................................................................................................... 1

## PRELIMINARY STATEMENT

Plaintiff respectfully seeks a Preliminary Injunction restraining Defendant and its agents, employees, members and volunteers, and all persons in active concert and participation with Defendant, from intimidating, threatening, harassing, or coercing voters in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). Pursuant to Fed. R. Civ. P. 65(a) and L. Civ. R. 65.1, Plaintiff has provided actual notice to Defendant at the time of making this application, and will provide copies of all pleadings and papers filed in this action to date.

Preliminary injunctive relief is needed before Election Day, November 8, 2016, to protect the right of all New Jersey voters, including minority and other voters, to be free from intimidation, harassment, and coercion at the polls. As explained below, the allegations set forth in the accompanying Complaint justify preliminary injunctive relief to prevent irreparable harm on Election Day. An injunction against Defendant's planned intimidation tactics is the only way to protect lawfully registered voters from harassment, threats, intimidation and coercion that could interfere with their ability to vote.

To obtain temporary or preliminary injunctive relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *See*, *e.g.*, *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 *F.2d* 797, 800 (3d Cir. 1989). Here, Plaintiff is likely to succeed on the merits of its claims under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3). Irreparable harm to Plaintiff, candidates, and voters is a near certainty in the absence of relief before Election Day. The balance of equities tips strongly in favor of barring Defendant from carrying out its plan to

intimidate, harass, and suppress voters. And an injunction barring such unlawful and flagrantly anti-democratic conduct is in the public interest.

Intimidation efforts aimed at suppressing minority voters have frequently been "ostensibly aimed at combatting voter fraud." *See Veasey v. Abbott*, 830 F.3d 216, 237 (5th Cir. 2016) ("[T]he record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity."). As this Court held in 2009, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud" that the defendant was trying to address through its vote suppression programs.  *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

## I.    STATEMENT OF FACTS

Plaintiff will rely on the facts set forth in the Complaint as supported by the exhibits to the Declaration of Barbara A. Ball ("Ball Decl."), which establish the Call to Action (actually, the call to voter suppression) by the Oath Keepers' national organization and the intention of the Defendant NJ Oath Keepers to answer the call.

## II.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A.  Plaintiff Is Likely To Prevail On Its Claim Under Section 11(b) Of The Voting Rights Act.

Plaintiff is likely to prevail on its claim that Defendant plans to violate Section 11(b) of the Voting Rights Act codified at 52 U.S.C. § 10307(b). That statute provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52

2

U.S.C. § 10307(b).[1] Section 11(b) was passed as part of the Voting Rights Act "to banish the plight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), but Congress intentionally drafted Section 11(b) "not [to] require proof that racial discrimination motivated the intimidation, threats, or coercion," *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *see also Cameron v. Johnson*, 262 F. Supp. 873, 884 n.9 (S.D. Miss. 1966) (same); H.R. Rep. No. 89-439, at 30 (1965) ("The prohibited acts of intimidation need not be racially motivated."), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.[2] Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968); *see Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

The operative words of Section 11(b)—to "intimidate," "threaten," and "coerce," or to attempt to do so – should be given their commonly understood meaning. *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016) ("Unless a statute provides an explicit definition, we generally give words 'their ordinary, contemporary, common meaning.'" (citation omitted)); *see, e.g.*, Merriam Webster (<u>intimidate</u>: "to make timid or fearful; to compel or deter by or as if by threats"; <u>threaten</u>: "to utter threats against; to hang over dangerously; to cause to feel insecure or anxious"; <u>coerce</u>: "to restrain or dominate by force; to compel to an act or

---

[1] Section 11(b) affords a private right of action. See *Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *Gray v. Main*, 291 F. Supp. 998, 999-1000 (M.D. Ala. 1966); see also 28 U.S.C. § 1343(a)(4).

[2] Attorney General Nicholas Katzenbach, who drafted much of the Voting Rights Act, explained to the Senate that "defendants [sh]ould be deemed to intend the natural consequences of their acts." Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm on the Judiciary, 89th Cong. 16 (1965).

3

choice; to achieve by force or threat.)[3] These terms cover not only the most powerful levers of state power, such as "arrest and prosecution," but also plainly apply to threatening, intimidating and coercive acts carried out by private individuals.

Section 11(b)'s reach is not restricted to overt acts of physical violence. Indeed, courts assessing comparable language in other civil rights statutes have held that terms such as "intimidating" and "threatening" include conduct short of actual violence. *See e.g. United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (finding intimidation due to a mass mailing to 14,000 Hispanics). As the Ninth Circuit held in *Nguyen*, "intimidation" is "not limited to displays or applications of force, but can be achieved through manipulation and suggestion," including "through subtle, rather than forcefully coercive means." *Id.* Other examples abound. *See e.g. Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.) (explaining that even if the intimidating and threatening conduct was not as "ominous, frightening, or hurtful [as] burning a cross . . . or assaulting the [victim] physically," there exist "less violent but still effective[] methods" by which an offender can frustrate a victim's protected rights, such as through "a *pattern* of harassment."); *see also, e.g., Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 613 (D.N.J. 2000) ("violence or physical coercion" is not "a necessary prerequisite" under a Fair Housing Act provision barring "coerc[ion], intimida[ion], [and] threaten[ing]").

As such, Courts assessing voter intimidation claims have looked to whether the challenged conduct would reasonably intimidate, threaten, or coerce voters. For example, during the 2004 election cycle, Senator Daschle challenged conduct committed by Republican candidate John Thune, the South Dakota Republican Party, and their agents as violating Section 11(b): The

---

[3] Available at http://www.merriam-webster.com/dictionary/.

4

district court granted a temporary restraining order and found Daschle was "likely to succeed" on his Section 11(b) claim, "as the Court finds that there was intimidation particularly targeted at Native American voters . . . by persons who were acting on behalf of John Thune." *Daschle v. Thune*, TRO at 2, No. 04-cv-4177 (D.S.D. Nov. 2, 2004)) (Ball Decl. at Exh. D). Although Daschle alleged intentional intimidation, the district court explained that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (concluding that the "inevitable effect" of challenged conduct would be to deter voters).

Just as in the *Daschle* case, such illegal conduct should be enjoined here. The court in *Daschle* entered a Temporary Restraining Order prohibiting a Republican Senate candidate and his supporters from continuing to "follow[] Native Americans from the polling places," "copy the license plates of Native Americans driving to the polling places" and record "the license plates of Native Americans driving away from the polling places." As shown in the Complaint, the national Oath Keepers organization has called for nearly identical conduct in an insidious effort to intimidate lawful voters from exercising their right to vote, targeting in particular minority voters. The Oath Keepers Call to Action instructs members to "look[] for suspected vote fraud activities, such as groups of people going from one polling place to another, voting multiple times," and to "[f]ilm[] them going to and from, and possibly discussing what they are doing." (Ball Decl. at Ex. C. at 4).

The evidence demonstrates that Defendant NJ Oath Keepers will heed those instructions here in New Jersey. Defendant has spread the Call to Action, posting a link to it on Facebook, (Ball Decl. at Ex. G), and Edward Durfee, a leader of NJ Oath Keepers, "tweeted" a link to the

5

video accompanying the Call to Action.  (Ball Decl. at Ex. F).  Furthermore, NJ Oath Keepers has also demonstrated a particular interest in the House election in New Jersey's Fifth Congressional District.  Durfee circulated invitations to an October 1, 2016 "meet and greet" event featuring the incumbent in the Fifth District, Rep. Scott Garrett. (Ball Decl. at Exs. H and I). Tickets for the event cost $20, payable to the American Bedrock Foundation ("ABF"). (Id.) Durfee later told *Bloomberg Businessweek* that ABF "is basically the fundraising arm for the Oath Keepers and other pro-Constitution groups."  During the event, according to *Bloomberg Businessweek*, Garrett called Durfee an "unsung hero" and told the audience, "What I need from you is your blood, sweat and tears. . . . We need the grass roots to come on out."  (Id.)

In addition, the Fifth District Race has been tarnished by anti-Semitic rhetoric associated with associated groups and followers of Oath Keepers. For example, one post circulated via the Oath Keepers Facebook account asserts that "jews/communists have taken the teaching of the Constitution out of our schools." (Ball Decl. at Ex. J). Even more ominous is an anonymous flyer circulating within the Fifth District that depicts Garrett's opponent, Josh Gottheimer, with hand-drawn horns saying that "big media owns me," invoking both ancient and contemporary anti-Semitic slanders. (Ball Decl. at Ex. K).

Plaintiffs need not show that Defendants' voter suppression efforts will be successful to obtain injunctive relief because only a *likelihood* of success on the merits must be shown for a preliminary injunction to issue. The law does not force Plaintiff to wait for intimidators to arrive at polling stations in New Jersey before obtaining injunctive relief.  As set forth above, Plaintiff has established the risk of Defendant's intimidating voters under Section 11(b), and Plaintiffs are likely to succeed on the merits of this claim.

### A.  Plaintiff Is Likely To Prevail On Its Claim Under The Ku Klux Klan Act, 42 U.S.C. § 1985(3).

Plaintiff's application should be granted for the independent but equally compelling reason that it is likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "KKK Act"). The relevant provision of the KKK Act, 42 U.S.C. § 1985, creates liability for several kinds of conspiracies. *See Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc); *see also United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J., dissenting).

Plaintiff's claim arises under § 1985(3)'s provision barring conspiracies to suppress voters, which provides: "[I]f two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy," and "one or more persons engaged" in that conspiracy commit an act in furtherance of the conspiracy that injures a person or deprives that person of a federal right, "the party so injured or deprived may have an action . . . ." 42 U.S.C. § 1985(3).

Courts have referred to this type of a § 1985(3) conspiracy as "a conspiracy to interfere with federal elections." *Bretz*, 773 F.2d at 1027 n.3. A straightforward reading of the statutory text, coupled with case law interpreting the KKK Act, makes clear that Plaintiff's claim in this case is likely to succeed. Oath Keepers recommends that its members work in teams, and they take their assignments from the leader of the organization or from the coordinator of the alleged fraud watch at the polls.

7

In the context of construing § 1985(3) conspiracy claims, the Supreme Court has explained that:

> to make out a violation of § 1985(3), . . .  the plaintiff must allege and prove four elements: (1) a conspiracy; (2) *for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws*; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Scott*, 463 at 828-29 (emphasis added). It follows that to establish a violation of the part of §1985(3) at issue here, a plaintiff must allege and prove the following four elements: (1) a conspiracy; (2) to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

Plaintiff is likely to succeed on the merits of its claim that Defendant and its members have engaged in a conspiracy. "A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012).

Plaintiff has proffered facts likely to prove that Defendant's members have agreed, tacitly and explicitly, to a "single plan" to suppress voting by minority and other voters in the 2016 Election in New Jersey, and that Defendant's leaders, each of its members, and its national organization all share in the "general conspiratorial objective."   The stated goal of NJ Oath Keepers' effort at the polls is to videotape or photograph voters and their vehicles, ostensibly to prevent voter fraud, but in effect to intimidate voters and cause some voters to stay away. The

8

message is clear enough:  If you don't want your photo or your license plate's photo taken and reported to authorities, don't come to the polls.

The Defendant's planned acts will injure Plaintiff in its capacity as the state-wide Democratic party organization in this State, both by harming its prospects in the upcoming election and by depriving lawful voters whose interests it represents of their legal right to vote in that election without intimidation. In the absence of relief before Election Day, any harm by Defendant's threats or acts will be irreversible.

### B. Defendants Have No Legally Cognizable Interest In Voter Intimidation Tactics.

Defendants cannot rely on the First Amendment for permission to intimidate and harass voters under the guise of poll-watching because "poll watching is not a fundamental right which enjoys First Amendment protection." *Dailey v. Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015), *report and recommendation adopted*, Mar. 23, 2015; *see Democratic Nat'l Comm.*, 671 F. Supp. 2d at 596 (rejecting as "meritless" the argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment"), *aff'd*, 673 F.3d 192 (3d Cir. 2012); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("no authority" for "the proposition that" a person has "a first amendment right to act as a pollwatcher"). The "position of poll-watcher," rather, is "a mere creature of state statute," *Cotz*, 476 F. Supp. 2d at 364, so any individual's supposed "right" to be a poll-watcher "derive[s] solely from state law," *Turner*, 583 F. Supp. at 1162; *see Dailey*, 2015 WL 1293188, at *5 (rejecting the argument that "poll watching is actually a First Amendment right that 'transcends' merely serving as a poll watcher"; "Plaintiff

9

provides no case law to support [that] argument"). "[T]he State is not constitutionally required to permit pollwatchers." *Turner*, 583 F. Supp. at 1162.

It is sensible and unsurprising that courts have rejected extending the First Amendment to poll-watching activities because that conduct is a form of law-enforcement delegable by States, rather than a form of expressive speech. *See Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008) (poll-watching involves "a citizen challeng[ing] another citizen's right to vote"); *Tiryak v. Jordan*, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) ("the position of poll-watcher" is "a state responsibility" that constitutes "delegation" of the State's authority over "the conduct and organization of elections" to "the political parties").

Nonetheless, any purported right to engage in poll watching must give way to the compelling state interest in securing the franchise by preventing voter intimidation. "Poll watching, . . . although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of minority voters." *Ne. Ohio Coal. for the Homeless v. Husted*, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part and rev'd in part*, __ F.3d __, 2016 WL 4761326 (6th Cir. Sept. 13, 2016); *see Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree.")(Debevoise, J.), *aff'd*, 673 F.3d 192 (3d Cir. 2012). It is impossible to ignore the "fear and intimidation" racial minorities face in some areas where "poll watchers . . . dress in law enforcement-style clothing for an intimidating effect." *Veasey v. Perry*, 71 F. Supp. 3d 627, 636-37 (S.D. Tex. 2014), *aff'd in part and rev'd in part and remanded*, 830 F.3d 216 (5th Cir. 2016).

10

For each of these independent reasons, there is no First Amendment or other protection for the plans proposed by Defendant here.

## III. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In the absence of injunctive relief, Defendant's plans to intimidate minority voters are likely to succeed, causing irreparable harm to Plaintiff. That harm will be occasioned both by the loss of votes for Plaintiff's supported candidates, and by loss of voting rights by voters associated with the Plaintiff. *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 n.7 (2008) (citing *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.")); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004). U.S. political history suggests that Defendant's scheme is neither anomalous nor unthreatening—to the contrary, voter intimidation efforts have been known to compromise the integrity of both federal and state elections. *See, e.g.*, *Ne. Ohio Coal. for the Homeless*, 2016 WL 3166251, at *28 ("Poll watching, . . . although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of minority voters."); *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree."), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

Defendants have expressed their intention to – as a matter of law – seek to intimidate and suppress New Jersey voters, and it is clear that abridgment of the right to vote constitutes an irreparable injury. *See Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); s*ee also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("deprivation of

11

constitutional rights unquestionably constitutes irreparable injury."); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (same specifying voting rights).

Courts find irreparable harm where, as here, the right to vote is threatened, even if the impingement is not yet complete. "There can be no 'do-over' or redress of a denial of the right to vote after an election," so "denial of the right to vote constitutes a strong showing of irreparable harm." *Fish v. Kobach*, __ F.3d __, 2016 WL 6093990, at *30 (10th Cir. Oct. 19, 2016) (irreparable harm where "over 18,000 Kansans stood to lose the right to vote in the coming general elections"); *see, e.g.*, *Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers) (granting injunction enjoining a bond referendum election because "[p]ermitting the election to go forward [without statutory protection] would place the burdens of inertia and litigation delay on those whom the statute was intended to protect"); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . . This makes sense generally and here specifically because whether the number is thirty or thirty-thousand, surely some North Carolina minority voters will be disproportionately adversely affected in the upcoming election. And once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done . . . ."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

In the absence of preliminary relief, Defendants' voter intimidation and suppression scheme is likely to cause significant and widespread harm to voters' ability to exercise the

franchise. This will both prevent voters affiliated with Plaintiff from having their votes counted and impair the candidates that Plaintiff supports. Such likely denial of voting rights is irreparable harm supporting immediate injunctive relief.

## IV.    THE BALANCE OF EQUITIES FAVORS PLAINTIFF

### A. Preventing Voter Intimidation And Coercion Is A Critical Interest Enshrined In Federal Law.

"[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part). Indeed, the constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Constitution secures the "citizen's right to a vote free of arbitrary impairment by state action," including intimidation by state-authorized poll-watchers (who themselves have no countervailing constitutional right to vindicate). *Baker v. Carr*, 369 U.S. 186, 208 (1962).

Given the fundamental nature of the franchise, Congress in the aftermath of previous voter suppression efforts in American history responded forcefully by enacting laws that unequivocally prohibit voter intimidation. In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters. In the 1960s, in response to the menacing of African-Americans who sought their full rights at the

13

ballot box, Congress prohibited threats and intimidation against any and all persons engaged in the democratic process. Through these actions, Congress embedded tools in federal law – the laws that Plaintiff invokes here – to ensure that elections in the United States will be free from harassment and intimidation at the polls.

As explained above, Defendant and its agents have no countervailing right to poll-watching or election observation. Rather, the ability to poll-watch is entirely a state-created interest; thus, poll-watching activities in federal elections are permissible only insofar as they comply with the federal laws proscribing voter intimidation. *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *see also* U.S. Const. art. I, § 4 ("Congress may at any time by Law make or alter [state] Regulations" governing congressional elections); *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (the Elections Clause "embrace[s] authority to provide a complete code . . . in relating to . . . protection of voters"); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2257 (2013) ("the Elections Clause empowers Congress to regulate *how* federal elections are held"). Moreover, even activities that comply with the strict letter of state election procedures will violate Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote. *See Katzenbach*, 250 F. Supp. at 348 (noting that "acts otherwise lawful may become unlawful and be enjoined under [section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

### B.  Widespread Or Systemic Voter Fraud Is A Myth.

The claimed rationale for Defendant's plan to trail and photograph voters is to combat alleged voter fraud. But widespread voter fraud is a myth. One recent study discovered only "31 credible incidents" of in-person voter fraud – out of *one billion* votes cast. (Ball Decl. at Ex. E) (Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible*

14

*Incidents Out of One Billion Ballots Cast*, Washington Post, Aug. 6, 2014). The actual frequency of substantiated claims of voter fraud reveals that efforts to combat it are misguided at best and pretextual at worst; in many if not most cases, the true purpose of voter fraud initiatives is to suppress voter turnout.

The courts that have examined the evidence have concluded that widespread voter fraud does not exist. *See e.g. Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014); *One Wis. Inst. v. Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016); *League of Women Voters*, 769 F.3d at 246; *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014); *Lee v. Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016).

## V.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

### A.  The Preliminary Relief Plaintiff Seeks Would Simply Enforce Federal Law.

The preliminary relief that Plaintiff seeks would enforce federal law securing the right to vote, which clearly advances the public interest. Plaintiff asks this Court to enjoin Defendant from voter intimidation activity. As described above, voter intimidation is expressly prohibited by Section 11(b) of the Voting Rights Act, which provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). Defendant's members will also conspire to intimidate lawful voters into staying away from the

polls in violation of the KKK Act, 42 U.S.C. § 1985(3). Plaintiff's requested injunctive relief does no more than effectuate the mandate of federal law.[4]

### B.  The Public Interest Is Advanced By Securing The Right To Vote, Not By Its Suppression.

"In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of . . . candidates, and their potential supporters." *Hooks*, 121 F.3d at 883-84. "By definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247; *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote") (internal quotation marks omitted); *Husted*, 697 F.3d at 437 ("That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."); *Sanchez*, 2016 WL 5936918, at *10 ("The public interest is served by the enforcement of [federal voting rights law] and the inclusion of protected classes in the political process."); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006) ("the public interest weighs strongly in favor of letting every eligible resident of Washington register and cast a vote").

An injunction is particularly favored where – as here – there is no credible argument that an injunction against Defendant "would interfere with the state's ability to move forward with the November election as scheduled." *Sanchez*, 2016 WL 5936918, at *10.

For all of these reasons, the public interest clearly would be advanced by the injunction sought here. Against a backdrop of widespread past and threatened future voter intimidation and

---

[4] Plaintiff's requested relief would also further the interests of New Jersey's statutory provisions that regulate and restrict poll-watching activity. See, e.g., *N.J.S.A.* 19:34-6. Indeed, Plaintiff's requested relief would support compliance with New Jersey laws that protect New Jersey voters from vigilante poll watchers' unlawful interference with their votes.

16

*de minimus* evidence of voter fraud, Defendants cannot be permitted to engage in conduct that threatens the most basic right in American democracy—the right of voters to cast their votes free of coercion and intimidation. "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

## VI.    CONCLUSION

For all of the above reasons, Plaintiff New Jersey Democratic State Committee respectfully requests that this Court grant Plaintiff's application for preliminary injunctive relief before Election Day.

Respectfully submitted,

/s/ Rajiv D. Parikh
Rajiv D. Parikh
Brett M. Pugach
**GENOVA BURNS LLC**
494 Broad Street
Newark, NJ 07102
(973) 533-0777
rparikh@genovaburns.com
bpugach@genovaburns.com

Dated:  November 3, 2016

21726/002/13784276v3

17